OPINION
Defendant-appellant, Earl W. Redding, appeals an order of the Clinton County Court of Common Pleas awarding plaintiff-appellee, Helen D. Redding, "an immediate one-half separate interest" in Earl's annuity policies (the "TIAA-CREF Annuity Policies") through a Qualified Domestic Relations Order ("QDRO").
The parties were married on August 11, 1954. On March 19, 1986, the parties entered into a separation agreement which provided in relevant part that:
[Section 2.B] TIAA-CREF Annuity Policies
 Earl W. Redding is the holder of insurance and annuity policies in connection with his profession with Teachers Insurance and Annuity Association (TIAA) and College Retirement Equities Fund (CREF). It is agreed between the parties that on his retirement, or upon his death, whichever event first occurs, and at which time these policies shall come into their distribution capabilities, Helen D. Redding shall share in and receive one-half of the policies' benefits, in such manner as may be of benefit to her.
The separation agreement was incorporated into a dissolution decree on June 9, 1986. The decree provided in relevant part that "the Petitioners shall fulfill each of the obligations imposed by the terms of the Separation Agreement, made a part hereof by reference, and which has been agreed to by Petitioners, subject to such further order of this Court as may be made in the premises."
On June 5, 1998, Helen moved the trial court to amend the dissolution decree to reflect that the TIAA-CREF Annuity Policies were marital property and to award her "50% of that portion of accumulation of each of the policies between their beginning date of June 1, 1963 (the date of [Earl's] beginning employment) and the dissolution decree of June 9, 1986 * * *." In a decision filed on October 13, 1998, the magistrate noted that a QDRO had not yet been entered to effectuate the division of the policies' benefits. The magistrate noted that Helen's motion was inartfully titled "Motion to Amend Dissolution Decree," because the true nature of her motion was not to modify the dissolution decree but to effectuate through a QDRO the pension division outlined in the decree. The magistrate granted Helen's motion after finding that:
 The only way legally to effectuate the clear meaning of Section 2.B and legally protect Helen's one-half interest against complete loss or partial loss due to Earl's untimely death is to have the court issue a QDRO giving Helen an immediate one-half interest in the annuity policies.
 Therefore, pursuant to the clear meaning of Section 2.B of the petitioners' Separation Agreement that was incorporated into this court's Decree of Dissolution, Helen's attorney shall immediately prepare and submit to the court a QDRO which gives Helen an immediate one-half interest in the policies identified in Section 2.B of the petitioners' separation agreement.
Earl timely filed objections to the magistrate's decision. By entry filed June 1, 1999, the trial court overruled Earl's objections and affirmed and adopted the magistrate's decision. On June 28, 1999, the trial court entered a QDRO reflecting its earlier entry.
Earl timely filed this accelerated appeal and raises as his sole assignment of error that the trial court "erred in asserting jurisdiction to reallocate Husband's previously divided annuity." Earl contends that the trial court's order not only violates R.C.3105.171(I), which prohibits post-decree modification of marital property division, it also exceeds the limited jurisdiction reserved in the dissolution decree to carry out the intent of the parties.
A QDRO "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan * * *." Employee Retirement Income Security Act (ERISA) of 1974, Section 206(d)(3)(B)(i)(I); Section 414(p)(1)(A)(i), Title 26, U.S. Code. A QDRO allows the nonparticipating spouse to deal directly with the fund rather than the former spouse. Haller v. Haller (Mar. 18, 1996), Warren App. No. CA95-06-063, unreported, at 7-8, fn. 2. A QDRO is thus "an order in aid of the relief that the court has previously granted."Benson v. Benson (Jan. 16, 1998), 1998 WL 28002, at *5, Clark App. No. 97-CA-0009, unreported.
We note at the outset that in its dissolution decree, the trial court retained jurisdiction to make "such further order[s] * * * as may be made in the premises." While a trial court does not have continuing jurisdiction to modify a marital property division incident to a divorce or dissolution decree, R.C. 3105.171(I), see, also, Ricketts v. Ricketts (1996), 109 Ohio App.3d 746, it has the power to clarify and construe its original property division so as to effectuate its judgment. Peterson v. Peterson
(July 12, 1999), Butler App. No. CA98-07-145, at 3-4, unreported. "Where there is confusion over the interpretation to be given to a particular clause, the trial court in enforcing the agreement has the power to hear the matter, clarify the confusion, and resolve the dispute." In re Dissolution of Marriage of Seders (1987),42 Ohio App.3d 155, 156-157. An interpretative decision by the trial court cannot be disturbed on appeal absent a showing of an abuse of discretion. Id. at 156. In addition, a trial court has "full power" to enforce the provisions of a separation agreement which has been incorporated into a dissolution decree. Cherry v. Figart
(1993), 86 Ohio App.3d 123, 126.
In the case at bar, it is clear from the dissolution decree that the parties intended Helen to receive her fair share of Earl's annuity policies' benefits upon his retirement or death. The decree, however, did not address what would happen to Helen's share of Earl's annuity policies' benefits were Earl to die prematurely. The magistrate stated that:
 Helen argues that the specific language in the decree clearly gives her a "separate" one-half interest in the annuity policies, and that she has a right to request the court to issue a QDRO to that effect. Her interpretation of the decree language would give her a full one-half interest that could not be eliminated or reduced upon Earl's death prior to or after his retirement. Also under Helen's interpretation, her one-half interest would not be subject to Earl's decisions regarding the type of payout he requests (i.e., guaranteed for a specific number of years, designated beneficiary, etc.).
 Earl argues that the language in the decree clearly gives Helen only one-half share interest in his benefits after they are paid to him, and that the language was not meant to give Helen a one-half interest in the policy benefits as a whole. This approach is known as the "shared payment approach." Under this approach, the alternative payee (Helen) will only receive payments when and if the participant (Earl) receives payments.
 If the court were to accept Earl's interpretation, and Earl were to die prior to receiving any benefits and Helen were still alive, Helen would never receive any benefits, because the decree does not provide that she is to retain any survivorship benefits. (Earl, perhaps realizing the inequity of his suggested interpretation, indicated in court that he would of his own volition provide Helen with some sort of survivorship benefits of his own choosing.) Also, under Earl's interpretation of the decree language, if he were to die after beginning to receive benefits and Helen were still alive, Helen would again lose all annuity benefits. In contrast, if Helen were to predecease Earl, under Earl's interpretation, Earl would be entitled to both his one-half interest and the one-half interest Helen was receiving or was to receive. That is, under Earl's interpretation, if Helen dies first Earl would receive a windfall, but if Earl dies first Helen would lose all annuity rights under the decree.
 A phrase in Section 2.B indicates that Helen "shall share in and receive one-half of the policies' benefits, in such manner as may be of benefit to her." (Emphasis added). If Earl's interpretation were adopted Helen could conceivably receive no or very little benefit, and that last phrase would have no meaning.
 The only way legally to effectuate the clear meaning of Section 2.B and legally protect Helen's one-half interest against complete loss or partial loss due to Earl's untimely death is to have the court issue a QDRO giving Helen an immediate one-half interest in the annuity policies.
We find that the foregoing language clearly shows that the trial court did not modify the dissolution decree. Rather, the trial court retained jurisdiction to clarify and construe its original property division with regard to Earl's annuity policies' benefits so as to effectuate and enforce its judgment. Again, "[w]here the disputed clause in the agreement is subject to more than one interpretation * * *, the court has broad discretion in clarifying the ambiguous language by considering not only the intent of the parties but also the equities involved." Weller v.Weller (1996), 115 Ohio App.3d 173, 179. We find that the trial court's interpretation of Section 2.B of the separation agreement is not so unreasonable, arbitrary, or unconscionable as to connote an abuse of discretion. As a result, the trial court's reservation of jurisdiction was not improper under R.C.3105.171(I).
We therefore find that the trial court did not err in asserting jurisdiction to issue a QDRO. Earl's sole assignment of error is overruled.
Judgment affirmed.
YOUNG, P.J., and VALEN, J., concur.